IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINE M. SCAPPINO, | ) | CASE NO. 1:12-cv-02694 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Christine M. Scappino ("Plaintiff" or "Scappino") seeks judicial review of the

final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her application for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 12.

As explained more fully below, the ALJ erred with respect to her consideration of the

evidence.  The ALJ concluded that there was no indication that Scappino had been diagnosed

and treated for fibromyalgia.  However, the medical evidence indicates otherwise.  In addition,

contrary to the provisions of SSR 06-03p, the ALJ did not discuss or even mention the opinion

offered by Scappino's physical therapist that reflects significant functional limitations.[2] In light

of these errors, the Court is unable to assess whether the ALJ's assessment of Scappino's

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R.
CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

[2] Although Scappino's physical therapist is not an "acceptable medical source," SSR 06-03p nevertheless
requires that "the case record should reflect the consideration of opinions from medical sources who are not
'acceptable medical sources. . .'".  SSR 06-03p, 2006 WL 2329939, * 6 (Aug. 9, 2006).  See discussion
below.

credibility and ultimate disability determination are supported by substantial evidence.
Accordingly, the Commissioner's decision is **REVERSED and REMANDED** for further
proceedings consistent with this Opinion.

## I.  Procedural History

Scappino filed an application for Disability Insurance Benefits ("DIB") on or about
March 16, 2009.[3]  Tr. 55-56, 137.  She alleged a disability onset date of April 17, 2008 (Tr. 137,
151, 160) and claimed disability due to degenerative disc disease and pain in her neck, foot, leg,
hip and back (Tr. 36, 60, 65, 72, 76, 160, 205).  After initial denial by the state agency (Tr. 60-
68), and denial upon reconsideration (Tr. 72-78), Scappino requested a hearing (Tr. 79-87).  On
April 6, 2011, Administrative Law Judge Julia A. Terry ("ALJ") conducted an administrative
hearing.  Tr. 32-54.

In her April 15, 2011, decision (Tr. 12-31), the ALJ determined that Scappino had not
been under a disability from April 17, 2008, through the date of the decision.  Tr. 15, 24-25.
Scappino requested review of the ALJ's decision by the Appeals Council.  Tr. 10-11.  On August
24, 2012, the Appeals Council denied Scappino's request for review, making the ALJ's decision
the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.  Personal, educational and vocational evidence

Scappino was born in 1968 and was 42 years old at the time of the April 6, 2011, hearing.
Tr. 32, 137.  She has a high school education.  Tr. 166.  Scappino rents from a friend and she
resides with her minor son.  Tr. 42, 387.  She is divorced.  Tr. 387.

---

[3] The actual date of filing is not raised as an issue on appeal.  However, the Court notes that the record reflects
different application filing dates.  The Disability Determinations and Transmittals (Tr. 55-56) and the ALJ decision
reflect an application filing date of March 16, 2009.  However, the Application Summary for Disability Insurance
Benefits reflects an application filing date of March 18, 2009.  Tr. 137.

Scappino last worked in 2006 at Carlton Cards as an assistant manager.  Tr. 37, 168, 583.
She stopped working because she had lost daycare for her son and decided that she would stay
home with him.  Tr. 37.

## B.  Medical evidence

### 1.  Treating medical providers

#### a.  Physical impairments

_Angela Brinkman, D.O. and Glenn Beck, M.D._

On April 14, 2008, Scappino saw Dr. Angela Brinkman, D.O. and/or Dr. Glenn Beck,[4]
M.D. of UHMP [University Hospitals], with complaints of low back pain and pain going into her
legs.[5]  Tr. 306-308, 352-353.  On examination, Dr. Brinkman assessed Scappino with L5 lumbar
strain with a history of degenerative disc disease with radiculopathy on the right.  Tr. 308.  Dr.
Brinkman ordered a lumbar x-ray and prescribed medication, including a Medrol dose pack,
Flexeril and Naprosyn.  Tr. 308.  Scappino's April 14, 2008, lumbar x-ray revealed degenerative
disc disease with neuroforaminal stenosis at L5-S1.  Tr. 311.  Dr. Brinkman also ordered an MRI
of Scappino's lumbar spine, which was performed on May 22, 2008.  Tr. 312.  The MRI showed
"[a]nnular bulging at L5-S1 and slight adduction of the diameter of the intervertebral foramen on
the right at this level."  Tr. 312.   On June 2, 2008, Scappino saw Dr. Brinkman for follow up.

---

[4] Various treatment notes are stamped "UHMP Drs. Beck and Brinkman" and the treatment notes are not entirely
legible. _See e.g._, Tr. 673-696.  It is not entirely clear whether Scappino was treated solely by Dr. Brinkman or by
both Dr. Brinkman and Dr. Beck.  For purposes of summarizing and referring to the medical treatment provided by
Dr. Brinkman and/or Dr. Beck, the Court refers only to Dr. Brinkman.

[5] Scappino's medical records reflect that, on January 15, 1993, because of a work related injury, Scappino
underwent a diskogram and laser disk decompression of the L5 on the right.  Tr.  240-243. She tolerated the
procedure well.  Tr. 240. On June 26, 2006, with respect to her allowed conditions of strain/sprain lumbar and
thoracic, herniated disc L4-5, Scappino saw Dr. M.P. Patel, M.D., for a medical impairment evaluation.  Tr. 254-
256.  Dr. Patel opined that Scappino's conditions resulted in a 34% whole person impairment.  Tr. 255.

Tr. 344.  She continued to have back pain.  Tr. 344.  Scappino indicated that she was not sure if her pain was related to her workers compensation claim or not.[6]  Tr. 344.

On February 24, 2010, Scappino saw Dr. Brinkman with complaints of tingling and numbness going into both arms and hands.  Tr. 572.  In April and May of 2010, Scappino saw Dr. Brinkman for edema in her legs, ankles and feet.  Tr. 689-696.  Dr. Brinkman continued Scappino on Lasix.  Tr. 689.    In June 2010, Scappino saw Dr. Brinkman for continued severe pain.  Tr. 688.  Dr. Brinkman noted positive fibromyalgia findings.[7]  Tr. 685, 688.

During another June 2010 visit, Scappino saw Dr. Brinkman for follow up because of swelling in her hands and she also reported being very fatigued.  Tr. 685.  Dr. Brinkman recommended a sleep study and it appears that Dr. Brinkman again noted positive fibromyalgia findings.  Tr. 685.  On August 2, 2010, Scappino underwent a clinical polysomnography for loud snoring and sleepiness during the day.  Tr. 612-621.  Dr. Raymond Salomone, M.D., prepared a report wherein he indicated that the sleep study showed that Scappino had obstructive sleep apnea.  Tr. 612.   Recommendations included: possible CPAP titration study because of the arterial oxygen desaturations, weight loss, smoking cessation, a pulmonary function study, and possibly a chest x-ray.  Tr. 613.  On December 29, 2010, Scappino reported using a CPAP machine most nights and sleeping well.  Tr. 697.   At the hearing on April 6, 2011, Scappino confirmed use of a CPAP machine but indicated that it might help more if she was able to sleep through the night. Tr. 44.

---

[6] Scappino was informed that Dr. Brinkman did not take old BWC cases.  Tr. 344.

[7] The treatment notes are not entirely clear but it appears that Dr. Brinkman noted "+ 14 of 16 fibromyalgia."  Tr. 688.

Scappino continued to see Dr. Brinkman.  Tr. 671-687.  On October 22, 2010,[8] Dr. Brinkman indicated that all fibromyalgia trigger points were present and prescribed Lyrica.  Tr. 676.   On December 8, 2010, Scappino saw Dr. Brinkman for right knee and leg pain.  Tr. 673.  She was referred to physical therapy.  Tr. 673.  Records show follow up visits with Dr. Brinkman in early 2011 for knee and ankle pain.  Tr. 723-724.

_Bruce Piszel, M.D._

From mid-2008 through March 2011, Dr. Bruce Piszel, M.D., of the Center for Advanced Pain Medicine, treated Scappino for her back pain.  Tr. 317, 336, 406-428, 435-446, 480-486, 488-505, 545-564, 609-610, 634-655, 703-711.   During the course of that treatment, Dr. Piszel administered medial branch blocks to Scapinno's lumbar and cervical spine and hip (Tr. 317, 411-412, 649-650, 651-652, 653-654); epidural steroid injections (Tr. 419-420, 545-546); and a cervical interlaminar injection (Tr. 560-561).

Diagnostic tests were performed during Dr. Piszel's treatment of Scappino, including three MRIs: (1) a July 7, 2009, lumbar spine MRI showing mild diffuse annular bulging of disc, more prominent toward right side, and mild hypertrophic degenerative facet joint disease at L5-S1 causing mild right neural foraminal stenosis and no other abnormality and no change compared to the May 22, 2008, MRI (Tr. 488); (2) December 21, 2009, cervical spine MRI showing right paramedian disc osteophyte at C5-C6 with associated narrowing of the neural foramen and small central disc protrusions at C4-C5 and C6-C7 (Tr. 553-554); and (3) a May 26, 2010, cervical spine MRI showing persistent small central protrusion of the discs at the C4-C5, C6-C7 and probable tiny right paracentral protrusion of the disc at the C5-C6 without significant

---

[8] On October 14, 2010, Scappino was admitted to the emergency room at Lake Hospital System with reports of numbness and weakness in both legs and difficultly standing.  Tr. 662-671.  A CT scan was negative and her blood work was unremarkable.  Tr. 662.  She was referred for a neurological consult and transferred to the tertiary center.  Tr. 662.  It is unclear what occurred with respect to Scappino's treatment following her transfer to the tertiary center, but, on October 22, 2010, she saw Dr. Brinkman.  Tr.  676.

interval changes and mild encroachment of bilateral neural foramina at the C4-C5 and left neural
foraminal encroachment at the C3-C4 (Tr. 609-610, 655).

Also, nerve conduction and EMG studies were performed on August 14, 2009, to
evaluate for lumbrosacral radiculopathy.  Tr. 399, 489, 718-720.   Dr. Gary R. Kutsikovich,
M.D., board certified in neurology, prepared a report with respect to those studies.  Tr. 399, 403,
719-720.  He indicated that the EMG revealed mild L5 radiculopathy on the left side.  Tr. 399,
403, 719-720.   On December 17, 2009, Dr. Kutsikovich completed a form at the request of the
Bureau of Disability Determination.  Tr. 713-715.  He indicated that he had only seen Scappino
for an EMG.  Tr. 714.  He indicated that Scappino had a diagnosis of lumbar radiculopathy.  Tr.
714.  More particularly, he referred to his report which indicated mild L5 radiculopathy on left.
Tr. 714.  As for work related limitations, Dr. Kutsikovich opined that Scappino should not bend,
squat, sit or stand for prolonged periods and  he recommended against lifting more than 15-20
pounds.  Tr. 715.

*Lori A. Krebs, PT*

From July 9, 2009, through November 18, 2009, Scappino participated in physical
therapy with physical therapist Lori A. Krebs for back pain and pain radiating into her hips and
legs.[9]  Tr. 462-476, 516-532.   In a September 24, 2009, re-evaluation, Ms. Krebs reported that
Scappino had partially met her goals.  Tr. 466, 475.  On September 28, 2009, Scappino was
advised to continue with a home exercise program.  Tr. 475-476.  Records show that, on
November 18, 2009, Scappino returned for physical therapy, with a notation that she had been
unable to attend physical therapy since October 27, 2009, because she was limited by insurance.
Tr. 520-521.

---

[9] Scappino's physical therapy was conducted through Layton Physical Therapy Co., Inc.

On December 17, 2009, Ms. Krebs completed a form wherein she described Scappino's complaints of pain, which included a pain level of 4 or 5 out of 10 in the lumbar area with pain radiating down her left leg and both hips.  Tr. 515.  Ms. Krebs indicated that Scappino was unable to stand longer than 10 minutes, had difficulty sleeping, putting on socks, doing laundry, carrying groceries and bending over.  Tr. 515.  Ms. Krebs described Scappino as having an antalgic gait with an inability to walk for more than 10 minutes.  Tr. 515.  Ms. Krebs also indicated that Scappino was limited in the amount of time that she could sit.  Tr. 515

On February 4, 2010, Ms. Krebs completed a Pain Questionnaire (Tr. 569) and a Medical Assessment of Ability To Do Work-Related Activities (Physical) (Tr. 569-570).  Ms. Krebs reported that she believed that, based on the consistency of Scappino's low back scores, Scappino was being truthful about her perception of pain.  Tr. 568.  With respect to Scappino's work-related abilities, Ms. Krebs indicated that Scappino would be limited to lifting/carrying 5 pounds; walking, sitting, or standing for 10 minutes at a time; no climbing, crouching, kneeling, or crawling; very little balancing and stooping; limited reaching, handling, and pushing/pulling; and no work at heights or with vibration.  Tr. 569-570.  She also indicated that Scappino would miss work more than 3 times each month.  Tr. 570.

Also, on December 16, 2010, Scappino started physical therapy for right knee sprain/strain.  Tr. 745.  Scappino continued with physical therapy through February 15, 2011 (Tr. 741-743), at which time she was discharged with instructions to continue at-home exercises (Tr. 739-740, 741).   At discharge, Ms. Krebs reported that Scappino had met or partially met her goals.[10]  Tr. 739.   Again, in March 2011, Scappino returned for further physical therapy to

---

[10] Scappino had partially met most goals but she had met her goal of "normal gait pattern."  Tr. 739.

address a diagnosis of plantar fasciitis (Tr. 735-737) and her complaints of right knee pain.  Tr. (731-734).

### b.  Mental impairments

On March 8, 2010, Dr. Madhuri Medarametla, M.D., conducted a psychiatric evaluation of Scappino.  Tr. 581-584.  Scappino reported being depressed with worsening conditions over the course of the prior year.  Tr. 581.  She was seeking treatment for her depression upon the recommendation of her pain management doctor.  Tr. 581.  Her reported symptoms included decreased energy, poor sleep secondary to her pain, crying spells, feelings of hopelessness and helplessness, weight gain of 60 pounds over the prior two years, anxiousness especially when she is unable to do things for her son.  Tr. 581-582.  She denied any suicidal ideation and denied any intention to hurt herself.  Tr. 583.  Scappino reported one psychiatric hospitalization that occurred after her son was born but indicated that until the prior year she had not experienced depression.  Tr. 582.  She indicated that she had not worked since 2006, when she quit her job to be with her son.  Tr. 583.  She also stated that her position was being eliminated and she wanted to quit before she was fired.  Tr. 583.  She scored in the mild range of anxiety and moderate range of depression.  Tr. 581-582.

Dr. Medarametla's diagnoses included major depressive disorder, single episode, severe without psychotic features.  Tr. 584.  She noted that depression secondary to general medical condition should be considered.  Tr. 584.  She assessed a current GAF score of 50-55.[11]  Tr. 584. As part of her recommended treatment plan, Dr. Medarametla started Scappino on Cymbalta,

---

[11] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

recommended that she continue the therapy that she had started with Miss Hiner,[12] and asked that she return to the clinic in three weeks for follow up or earlier if needed.  Tr. 584.

Thereafter, Dr. Medarametla saw Scappino from May 26, 2010, through February 15, 2011.  Tr. 622-632, 697-700.  As of her February 15, 2011, visit, Scappino's major depressive disorder was in partial remission[13] and she reported to Dr. Medarametla that she was "having ups and downs, but [she was] definitely ina [sic] better place than last year this time." Tr. 699.  In her February 16, 2011, letter detailing Scappino's progress, Ms. Hiner indicated that, per Scappino's psychiatrist's report, Scappino's major depressive disorder was in partial remission.  Tr. 727.

Ms. Hiner also stated:

> Christine's symptoms of depression are still figural topics for her counseling, and are exacerbated by stressors in her environment. She has shared that her mood feels more stable than this time last year. She has made progress in treatment adjusting to her current level of physical functioning. She is still working on goals around personal growth and releasing the pressure that she puts on herself to 'go it alone' and avoid 'being a burden.' Christine appears to be invested in, and benefit from, individual counseling. She is currently on my schedule on a biweekly (every two weeks) basis. Treatment review of Christine's case is tentatively scheduled for April 29, 2011.

Tr. 727.

### 2.  State agency opinions

#### a.  State consultative physician

On June 9, 2009, Naomi Waldbaum, M.D., conducted a consultative examination of Scappino.  Tr. 386-388.  Following her examination, Dr. Waldbaum's impression was:

---

[12] Beginning in March 2010, Scappino saw Ms. Krista Hiner for counseling sessions two times each month.  Tr. 727, 728.  Hiner submitted two letters detailing Scappino's progress.  Tr. 727, 728.  The first letter is dated November 15, 2010 (Tr. 728), and the second letter is dated February 16, 2011 (Tr. 727). Both letters are also signed by Ms. Hiner's supervisor, Tracy Doran, and Dr. Medarametla.  Tr. 727, 728.

[13] As Scappino progressed with treatment, her major depressive disorder was in remission or partial remission.  Tr. 623, 625, 629, 697, 699.

> Ms. Scappino is an early middle-aged, medically healthy lady who had an original history of back problems in 1994 when she underwent a laser treatment for disc herniation.  She developed pain again in April 2008 and has been having conservative treatment in the form of Oxycodone medication and injections into the spinal area.  She is due to have another injection next week.  Examination today reveals no significant abnormal pathology but the client became extremely apprehensive, tense, and rigid when I tried to evaluate the lower extremities and the back area.  I do feel that this client needs to complete her treatment and, hopefully, will be more functional.  I do feel that she should be able to perform many different types of sedentary to light type work activity.

Tr. 388.

### b.  State reviewing physicians

*William Bolz, M.D.*

On July 13, 2009, William Bolz, M.D., completed a Physical RFC Assessment.  Tr. 389-396.  He opined that Scappino was able to: lift/carry 20 pounds occasionally; lift/carry 10 pounds frequently; stand/walk (with normal breaks for about 6 hours in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; and, except for limitations as shown for ability to lift/carry, Scappino's ability to push/pull was unlimited.  Tr. 390.  He opined that Scappino could occasionally climb ramps and stairs but she could never climb ladders, ropes or scaffolds.  Tr. 391.  Also, he opined that she was limited to occasional stooping, kneeling, crouching, and crawling.  Tr. 391.

Dr. Bolz's opinion was based on his review of Scappino's daily activities, past medical history, including objective medical test results and diagnoses, and Dr. Waldbaum's consultative examination findings. Tr. 390-391.  With respect to Dr. Waldbaum's consultative examination, Dr. Bolz gave her opinions great weight because he found her opinions consistent with the evidence in the file. Tr. 395.  Dr. Bolz found Scappino's statements to be partially credible.  Tr. 394.  He noted that Scappino reported that she could only walk once around the block and that it

took her about 15 minutes but she also reported that she went grocery shopping every other

week, using a push cart and taking about an hour and half to complete her shopping.  Tr. 394.

> *Gerald Klyop, M.D.*

On March 8, 2010, Gerald Kylop, M.D., also completed a Physical RFC Assessment.  Tr.

573-580.  Like Dr. Bolz, Dr. Kylop opined that Scappino was able to: lift/carry 20 pounds

occasionally; lift/carry 10 pounds frequently; stand/walk (with normal breaks for about 6 hours

in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; and,

except for limitations as shown for ability to lift/carry, Scappino's ability to push/pull was

unlimited. Tr. 574.  He opined that Scappino could occasionally climb ramps and stairs but she

could never climb ladders, ropes or scaffolds.  Tr. 575.  Also, he opined that she was limited to

occasional stooping, kneeling, crouching, and crawling.  Tr. 575.

Dr. Kylop's opinion was based on a review of Scappino's allegations, her medical

history, including objective medical findings and diagnoses, and Dr. Wauldbaum's consultative

examination findings.  Tr. 574-575.  Similar to Dr. Bolz, Dr. Kylop found that Scappino's

statements were partially credible and he gave great weight to the opinions of Dr. Wauldbaum

because he found her opinions consistent with the medical evidence in the file.  Tr. 578-579.

## C.  Testimonial evidence

### 1.  Scappino's testimony

Scappino was represented and testified at the administrative hearing.  Tr. 37-47.  She

indicated that her disability began in April of 2008 when her back pain started.  Tr. 37.  After a

few days of severe back pain, Scappino contacted her doctor who sent her to a pain management

specialist.  Tr. 37.  She learned at that time that she had a degenerative disc in her back and

arthritis.  Tr. 37.  Since April 2008, Scappino's condition has worsened.  Tr. 37.  She has tried

injections to alleviate her pain but they have not worked.  Tr. 37-38.  Her doctors are trying to manage her pain through medication.  Tr. 38.  She takes Oxycontin but it makes her lightheaded, dizzy and tired.[14]  Tr. 38.

The pain from her back radiates down her leg and into her toes.  Tr. 41.  In addition to her back pain, Scappino has pain in both hips.  Tr. 40.  She stated that the pain in her hips could be from her degenerative disc but her doctors have also indicated that she may have a little arthritis in her hips.  Tr. 40.  Scappino indicated that she has been diagnosed with fibromyalgia.  Tr. 41.  She takes medication for it but does not always know how it will affect her.  Tr. 41.  Some days she cannot even shower because when the water hits her body it feels as if she is being hit with pellets.  Tr. 41.  Scappino has been taking Lyrica for her fibromyalgia and it has helped some but she estimates that her fibromyalgia flares up about 3 or 4 days each month so badly that she has to lie down all day.  Tr. 42-43.

Scappino has been referred to an orthopedic specialist but she does not want to have back surgery.  Tr. 43-44.  She sees a neurologist for the tingling in her legs.  Tr.  44.

At the time of the hearing, Scappino was in a cast and on crutches because of a recent diagnosis of plantar fasciitis in the foot.  Tr. 44.  Before deciding on whether surgery was necessary, her doctor recommended trying to immobilize her foot with a cast for a month to see if it would help with the pain.  Tr. 44.

Scappino started treatment for depression in 2010.  Tr. 46.  She indicated that it is very hard for her to sit at home and not be working.  Tr. 44.  She takes care of her son but feels that she would be able to take care of him better if she was able to work.  Tr. 44-45.  It is really hard for her to sit around and do nothing.  Tr. 45.  She used to have crying spells all the time but the

---

[14] She also takes Flexeril for her pain and Lasix for swelling in her hands and feet.  Tr. 43.  Because she takes Lasix, she has to take potassium.  Tr. 43.  She also takes Vitamin D because of a Vitamin D deficiency.  Tr. 43.  She takes Cymbalta for depression.  Tr. 43.

medication that she takes has helped a lot.  Tr. 45.  In addition to taking medication, Scappino has seen a psychologist and she sees her counselor at least once every other week.  Tr. 45.

Scappino has difficulty sleeping through the night because of pain (Tr. 41) and sleep apnea (Tr. 44).  She wakes approximately every hour because of the pain.  Tr. 41.  She wakes and switches positions and she usually is up to take pain medicine during the night.  Tr. 41.  She uses a CPAP machine and thinks it might help more if she did not wake throughout the night. Tr. 44. She takes naps during the day when her son is at school.  Tr. 42.  She either naps while lying down or sitting.  Tr. 42.  She can sit for about 10-15 minutes before having to get up and move around.  Tr. 38, 46.  During the hearing, Scappino described the fact that she was sitting but that she was holding herself up a little with her arm to try to find a comfortable position.  Tr. 39.  When she tries to adjust or hold her position while seated, she is unable to use both arms to perform tasks.  Tr. 39.  After about 15-20 minutes of standing, she has to sit or lie down.  Tr. 38, 46.  Also, she cannot lie down for long periods without having to get up and move.  Tr. 38.

Except for small items, she has not lifted or carried anything in a long time. Tr. 39.  She estimates being able to lift around 5 pounds.  Tr. 40.  When pouring from a gallon of milk, Scappino usually holds the bottom with one hand and pours with the other hand.  Tr. 40.  Since she lives with only her 7-year old son, she does most of the household chores but she does them very slowly.  Tr. 42.  Sometimes her son will help run the vacuum cleaner for her.  Tr. 42.  Scappino does not have a car but she is able to drive.  Tr. 46.  She drove herself to the hearing but she did not take her Oxycontin because of the side effects.  Tr. 38, 46.

During a typical day, Scappino gets her son up and ready for school.  Tr. 47.  He leaves the house around 8:00 a.m.  Tr. 47.  She then tries to get herself showered and some days she starts some cleaning.  Tr. 47.  Some days she is not able to finish all the cleaning because she has

to sit down or take a nap. Tr. 47. Her son returns home from school around 4:00 p.m. Tr. 47. Scappino then gets him some dinner, they spend time together, and then they go to bed. Tr. 47.

### 2. Vocational Expert's testimony

Vocational Expert ("VE") Mark Anderson testified at the hearing. Tr. 47-53.

The VE first described Scappino's past work, which included work as (1) an assistant manager (restaurant, fast food and retail card sales), a light, skilled position;[15] (2) a personnel scheduler, a sedentary, semi-skilled position; (3) a cashier, a light, unskilled position; (4) a dock worker/store laborer, a medium, unskilled position;[16] and (5) a shoe sales person, a light, semi-skilled position. Tr. 48-49.

The ALJ proceeded to ask the VE a series of hypothetical questions. Tr. 49. First, the ALJ asked the VE to assume an individual the same age and with the same education and work experience as Scappino who can perform light work lifting and carrying 10 pounds frequently and 20 pounds occasionally; can stand and walk for a total of 6 out of 8 hours; can sit for a total of 6 out of 8 hours; can perform all postural activities at least occasionally but can never climb ladders, ropes or scaffolds; should not operate lower extremity foot controls; and should have no exposure to work hazards such as unprotected heights and moving machinery. Tr. 49-50. The VE stated that the described individual could perform Scappino's past work as an assistant manager at a restaurant and fast food restaurant, as a cashier and as a shoe sales person, as she performed those positions and as the DOT[17] describes them being performed. Tr. 50. The

---

[15] The VE noted that Scappino reported performing her assistant retail manager job at the medium level and the other assistant manager jobs at the light level. Tr. 48.

[16] The VE noted that Scappino performed the dock worker/store laborer position at the light level. Tr. 48-49.

[17] The Dictionary of Occupational Titles is published by the Department of Labor. *See* 20 CFR § 404.1566(d)(1).

described individual could also perform Scappino's past work as dock worker/store laborer as she performed it but not as the DOT describes it.  Tr. 50.

The ALJ asked the VE to modify the first hypothetical such that the VE should assume that the individual was limited to a range of sedentary work with lifting and carrying of no more than 10 pounds occasionally; standing and walking a total of 2 out of 6 hours and sitting at least 6 out of 8 hours, with a need to alternate sitting and standing for approximately 5 minutes at least every 2 hours; staying at her work station; should never climb ladders, ropes and scaffolds but all postural activities would still be at least occasional; no operation of foot controls; and no concentrated exposure to work hazards; can perform simple and detailed work, but not complex; superficial interaction with others would not be limited but should avoid intense or confrontational interactions with others.  Tr. 50-51.  The VE stated that the described individual would not be able to perform Scappino's past work but there would be sedentary, unskilled jobs available to the individual, including (1) document preparer, with 180,000 positions available nationwide, 19,000 available statewide, and 4,000 available in northeast Ohio; (2) patcher,[18] with 120,000 positions available nationwide, 25,000 available statewide, and 4,500 available in northeast Ohio; and (3) inspector of circuit boards, with 158,000 positions available nationwide, 5,200 available statewide, and 1,700 available in northeast Ohio.  Tr. 51.

In response to further inquiry by the ALJ, the VE stated that adding an additional limitation of no high production quotas jobs would not affect the jobs that the VE had listed.  Tr. 52.

The ALJ then recounted Scappino's testimony regarding her stated limitations and asked the VE whether an individual with those limitations would be able to perform any jobs existing

---

[18] The VE indicated that a patcher assembles electrical components.  Tr. 51.

in the national economy.  Tr. 52-53.  The VE responded and indicated that there would be no

work available to such an individual.  Tr. 53.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy[19] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[20] claimant is presumed disabled without further inquiry.

---

[19] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[20] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her April 15, 2011, decision, the ALJ made the following findings:[21]

1.      Scappino meets the insured status requirements through December 31, 2011. Tr. 17.

2.      Scappino has not engaged in substantial gainful activity since April 17, 2008, the alleged onset date. Tr. 74.

3.      Scappino has the following severe impairments: obesity; a history of lumbar spondylosis; lumbar and cervical degenerative disc disease; sleep apnea; and a major depressive disorder, in partial remission. Tr. 17-18. The following impairments are non-severe: plantar fasciitis and fibromyalgia. Tr. 18.

4.      Scappino did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, including Listing 1.04 - *Disorders of the Spine* and Listing 12.04 – *Affective Disorders*. Tr. 18-20.

5.      Scappino has the RFC to perform a limited range of sedentary work. She can lift and/or carry no more than 10 pounds occasionally. She can stand

---

[21] The ALJ's findings are summarized.

and/or walk for 2 hours out of 8 hours and sit for 6 hours out of 8 hours, with the need to alternate sitting and standing for approximately 5 minutes at least every 2 hours but can remain at her workstation.  She should never climb ladders, ropes, and scaffolds, but can perform all other postural activities at least occasionally.  She should not operate foot controls and should not have concentrated exposure to work hazards.  She can perform simple and detailed work, but not complex work tasks.  She can have superficial interaction with others, but should avoid intense or confrontational interactions with others.  Tr. 20-23.

6.      Scappino is unable to perform any past relevant work. 23.

7.      Scappino was born in 1968 and was 39 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  Tr. 23.

8.      Scappino has at least a high school education and is able to communicate in English.  Tr. 23.

9.      Transferability of job skills was not material to the determination of disability.  Tr. 23.

10.     Considering Scappino's age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that she can perform, including document preparer, patcher, and inspector of printed circuit boards.  Tr. 23-25.

Based on the foregoing, the ALJ determined that Scappino had not been under a disability from April 17, 2008, through the date of the decision.  Tr. 24.

## V. Parties' Arguments

### A.      Plaintiff's arguments

Scappino presents five arguments.  First, she argues that the ALJ erred at Step Two by not only failing to consider her fibromyalgia to be a severe impairment but also by holding that her fibromyalgia was not a medically determinable impairment and failing to consider her fibromyalgia at later steps in the evaluation.  Doc. 15, pp. 10-12; Doc. 19, pp. 1-2.

Second, relying in part on *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 201),

Scappino argues that, even though the ALJ concluded at Step Three that Scappino had moderate

limitations in concentration, persistence or pace due to her pain, the ALJ's RFC did not sufficiently account for those limitations.[22]  Doc. 15, pp. 12-13.

Third, Scappino argues that the ALJ erred by failing to discuss the February 4, 2010, opinion of her physical therapist, Lori Krebs, P.T.  Doc. 15, pp. 14-15; Doc. 19, pp. 2-3. Scappino recognizes that a treating physical therapist is not entitled to the same consideration as a treating physician or psychologist but she argues that a physical therapist qualifies as an "other source" and therefore the ALJ's failure to consider that opinion at all was contrary to SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).  Doc. 15, pp. 14-15; Doc. 19, pp. 2-3.

Fourth, Scappino argues that the ALJ incorrectly relied upon the consultative examining physician Naomi Waldbaum's opinion that Scappino should be able to perform a range of sedentary to light work because that is an issue reserved to the Commissioner.  Doc. 15, pp. 15-17; Doc. 19, pp. 4-5.

Fifth, Scappino asserts that, because of the ALJ's other errors, the ALJ did not properly evaluate her credibility.  Doc. 15, pp. 17-18; Doc. 19, pp. 3-4.

**B.      Defendant's arguments**

In response to Scappino's first argument, the Commissioner argues that the ALJ did not err at Step Two because, although she did not find Scappino's fibromyalgia to be a severe impairment, she found other impairments, which can cause pain, to be severe impairments, including lumbar and cervical degenerative disc disease and a history of lumbar spondylosis. Doc. 16, pp. 13-14.  Thus, even if the ALJ erred in not finding Scappino's fibromyalgia to be severe, the Commissioner asserts that the error was harmless because the ALJ proceeded beyond Step Two.  Doc. 16, p. 14.

---

[22] Scappino asserts that, while the ALJ restricted Scappino in the RFC to "simple and detailed work but not complex tasks," the ALJ did not include a restriction for pace or speed based work.  Doc. 15, pp. 12-13.

In response to Scappino's second argument, the Commissioner argues that, unlike the claimant in *Ealy*, Scappino points to no record evidence that she suffered any speed or pace based restrictions.  Doc. 16, p. 15.  Thus, the Commissioner asserts that the ALJ's RFC sufficiently accounted for Scappino's moderate restrictions in concentration, persistence or pace. Doc. 16, p. 15.  The Commissioner also points out that, at the administrative hearing, in response to the ALJ's inquiry regarding what impact, if any, a restriction of no high production quota jobs would have on the sedentary jobs identified by the VE in response to the ALJ's sedentary hypothetical, the VE indicated that such a restriction would have no impact.  Doc. 16, p. 15, n. 9.

In response to Scappino's third argument, the Commissioner recognizes that the ALJ did not discuss Scappino's physical therapist's opinion but asserts that an ALJ is not required to discuss every piece of evidence and the ALJ did note that Scappino received physical therapy in 2009 and stated that she considered all of the evidence and the entire record.  Doc. 16, p. 16. The Commissioner also argues that, by virtue of the ALJ's ultimate disability determination, the ALJ implicitly discounted Ms. Krebs's opinion.  Doc. 16, p. 16.  Further, the Commissioner asserts that, based on the ALJ's decision and the record, Ms. Krebs's opinion was not entitled to significant weight.  Doc. 16, pp. 16-17.

In response to Scappino's fourth argument, the Commissioner argues that the ALJ's consideration of and reliance upon consultative examining physician Naomi Waldbaum's opinion, including her opinion that Scappino should be able to perform a range of sedentary to light work, was proper.  Doc. 16, p. 20.

In response to Scappino's fifth argument, the Commissioner argues that the ALJ conducted a proper credibility assessment and found Scappino's subjective complaints only partially credible.  Doc. 16, pp. 18-19.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.     Reversal and remand is warranted because the ALJ did not consider or failed to properly consider all the evidence in the record**

"An ALJ is bound to adhere to certain governing standards when assessing the medical evidence in support of a disability claim." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014) (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 545 (6th Cir.2004)). "Chief among these is the rule that the ALJ must consider all evidence in the record when making a

determination, including all objective medical evidence, medical signs, and laboratory findings." *Id.* (citing 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513).

Here, the ALJ did not consider all of the medical evidence.  Alternatively, if she did consider all of the evidence, her opinion does not allow this Court to follow her reasons for discounting certain evidence.  As discussed more fully below, the ALJ's findings with respect to Scappino's allegation of fibromyalgia suggest that she did not consider medical records which reflect that Scappino's treating physicians treated Scappino for fibromyalgia and the ALJ failed to discuss or even mention Scappino's physical therapist opinion that included significant functional limitations.  The ALJ's failure to consider and discuss this evidence does not allow this Court an opportunity to conduct a meaningful review to determine whether the ALJ's decision is supported by substantial evidence.  Thus, reversal and remand is warranted.

### 1.  The ALJ's findings with respect to fibromyalgia

Step two of the sequential evaluation - determining whether a claimant has a severe impairment - has been construed as a *de minimis* hurdle for a claimant to meet.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 19 85).  "Under the prevailing *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience."  *Id.*  The Commissioner's regulations state that "[a]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a), 416.921(a).  If a claimant does not have any impairment or combination of impairments that significantly limit his physical or mental ability to do basic work activities, he will be determined not to have a severe impairment.  20 C.F.R. § 404.1520(c), 416.920(c).

With respect to Scappino's fibromyalgia, at Step Two, the ALJ stated:

> The claimant testified that she suffers with fibromyalgia. She reported the same thing to mental health treating physician, Madhuri Medarametl, M.D., in November 2010 (Exhibit 30F). The only medical reference to a fibromyalgia diagnosis was in July 2010 when the claimant was treated in the emergency department for a near syncopal episode (Exhibit 28F). However, fibromyalgia was not included as an actual diagnosis; it was referenced in the claimant's past medical history section of the records. There is no indication that the claimant has actually been diagnosed and treated for fibromyalgia.

Tr. 18.

Scappino correctly asserts that the above findings are erroneous because her treating physicians diagnosed and treated her for fibromyalgia. Doc. 15, pp. 10-12; Doc. 19, pp. 1-2. For example, during a June 2010 office visit with "Drs. Beck and Brinkman," her doctor indicated that Scappino showed positive signs of "14 of 16 fibromyalgia."[23] Tr. 688. Later, during an October 22, 2010, office visit with "Drs. Beck and Brinkman," all fibromyalgia trigger points were noted to be present and Lyrica was prescribed. Tr. 676.

Since the ALJ's finding that fibromyalgia was not a severe impairment is based on an incorrect premise, i.e., that there had been no diagnosis and treatment for fibromyalgia, the ALJ's finding at Step Two with respect to fibromyalgia is not supported by substantial evidence.

The Commissioner asserts that, even if the ALJ erred by not finding fibromyalgia to be a severe impairment, the ALJ's error is harmless because the ALJ found that Scappino had severe impairments of lumbar degenerative disc disease, cervical degenerative disc disease, and history of lumbar spondylosis, which are conditions, like fibromyalgia, that can cause pain. Doc. 16, p. 14. The Commissioner is correct that, where an ALJ finds at least one severe impairment and proceeds to consider both the severe and non-severe impairments at subsequent steps of the sequential evaluation, an ALJ's error at Step Two may not be grounds for reversal. *Simpson*,

---

[23] During another June 2010 office visit, treatment notes reflect that Scappino reported being "very fatigued" and appear to reflect positive fibromyalgia findings. Tr. 685.

344 Fed. App. at 190; *see also* *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 19*87*) (the Commissioner's failure to find claimant's cervical condition severe was not reversible error because the Commissioner did find a severe impairment and continued with the remaining steps in the sequential evaluation process during which the Commissioner properly could consider the cervical condition when determining whether the claimant retained sufficient RFC to allow him to perform substantial gainful activity.). However, as discussed below, reversal and remand is warranted in this case.

Although the ALJ referenced Scappino's allegation of fibromyalgia and fatigue at later steps in the sequential evaluation, the ALJ appears to have dismissed those allegations based on the same incorrect premise, i.e., because the medical evidence did not support Scappino's allegations of fibromyalgia and fatigue.  Tr. 21-22.  As indicated, there are treating physician treatment records that document fibromyalgia and fatigue.  Tr. 676, 685, 688.  Thus, even though the ALJ mentioned Scappino's allegations of fibromyalgia and fatigue, the basis for discounting those allegations was a faulty review of the record.  Alternatively, if the ALJ saw the records from Drs. Beck and Brinkman, she failed to adequately explain why she discredited those treatment records.  Accordingly, the ALJ's same unsupported findings at Step Two with respect to Scappino's allegation of fibromyalgia were carried forward at subsequent steps in the evaluation.  Thus, without a more thorough analysis of, or explanation for, the ALJ's rejection of medical evidence documenting fibromyalgia and fatigue, the Court cannot conclude that the ALJ's stated basis for rejecting Scappino's allegations is supported by substantial evidence.

The ALJ also considered Scappino's claim that she has to lie down and nap during the day but dismissed her claim because the ALJ concluded that there was no indication that her treating physician advised her to lie down during the day or otherwise limit her activities and that

her pain management doctor, Dr. Piszel, noted that she was stable on her current medications without side effects.  Tr. 21.  However, since Scappino's claim that she was required to lie down or take naps was based in part on her fibromyalgia (Tr. 41-43), the Court cannot conclude that the ALJ's stated basis for rejecting Scappino's allegations is supported by substantial evidence without a more thorough analysis of or explanation for the ALJ's rejection of medical evidence documenting fibromyalgia and fatigue.

Accordingly, for the reasons discussed above, reversal and remand is warranted for further proceedings consistent with this Opinion.[24]

### 2.   The ALJ's failure to mention or discuss Plaintiff's physical therapist's opinion

On February 4, 2010, Plaintiff's physical therapist Lori Krebs completed a Pain Questionnaire (Tr. 568) and a Medical Assessment of Ability to Do Work-Related Activities. Tr. (Tr. 569-570).   With respect to Scappino's work-related abilities, Ms. Krebs indicated that Scappino would be limited to lifting/carrying 5 pounds; walking, sitting, or standing for 10 minutes at a time; no climbing, crouching, kneeling, or crawling; very little balancing and stooping; limited reaching, handling, and pushing/pulling; and no work at heights or with vibration.[25]  Tr. 569-570.  She also indicated that Scappino would miss work more than 3 times each month.  Tr. 570.

While recognizing that a treating physical therapist is not entitled to the same consideration as a treating physician or psychologist, Scappino argues that a physical therapist qualifies as an "other source" and therefore the ALJ's failure to consider and/or discuss Ms.

---

[24] Even if the Court were to find that the ALJ's Step Two finding with respect to fibromyalgia did not warrant reversal and remand, the ALJ erred in other respect as discussed herein.

[25] In the form completed by Ms. Krebs on December 17, 2009, she also indicated that Scappino was unable to stand longer than 10 minutes and was limited in the amount of time that she could sit.  Tr. 515

Kreb's February 4, 2010, opinion was contrary to SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).[26]  Doc. 15, pp. 14-15; Doc. 19, pp. 2-3.

The Commissioner concedes that the ALJ did not specifically reference Ms. Krebs's opinion and also appears to concede that, if Ms. Krebs's serious functional limitations were given great or substantial weight, Scappino might well have been found disabled.  Doc. 16, p. 16. However, the Commissioner argues that Scappino's argument is without merit because an ALJ is not required to refer to or analyze every piece of evidence; the ALJ recognized that Scappino underwent physical therapy in 2009; the ALJ stated that that she considered "all" the evidence and the "entire" record before issuing her decision; and, based on the decision and the record, Ms. Krebs's opinion would not be entitled to significant weight.  Doc. 16, pp. 16-17.

The Court agrees that Ms. Krebs, who is a physical therapist, is not an "acceptable medical source." *See* 20 C.F.R. § 404.1513.  However, pursuant to SSR 06-03p,

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' [and] [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or a subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p, 2006 WL 2329939, * 6.  The ALJ's decision mentions Scappino's 2009 physical therapy sessions but does not discuss or mention Ms. Krebs's February 4, 2010, opinion, nor does the ALJ's decision allow this Court to follow the ALJ's reasoning with respect to that opinion.

---

[26] On December 17, 2009, Ms. Krebs also completed a form with respect to Scappino condition and treatment.  Tr. 515.  Plaintiff does not appear to challenge the ALJ's failure to mention or discuss the December 17, 2009, form.

For example, when assessing the credibility of Scappino's allegations of pain, the ALJ states, in part, "[P]hysical therapy improved her pain levels to just 3-4 on the 1-10 pain scale when her pain level had been 8-10 out of 10 prior to treatment (Exhibit 19F)." Tr. 21. The ALJ also concluded that Scappino "had good results from physical therapy." Tr. 22. However, without a more complete discussion of how the ALJ reached these conclusions in light of the significant limitations contained in Ms. Krebs's opinion, the Court is unable to follow the ALJ's reasoning.

The Commissioner argues that an ALJ is not obligated to discuss every piece of evidence and relies upon the ALJ's reference to the physical therapy records to argue that reversal and remand is not warranted. Doc. 16, p. 16. However, the Commissioner's reliance upon the ALJ's reference to the physical therapy records is undermined by the fact that the physical therapy records referenced by the ALJ are contained in Exhibit 19F (Tr. 460-476) whereas Ms. Krebs's February 4, 2010, opinion is contained in a separate exhibit, Exhibit 24F (Tr. 565-570).[27] Additionally, although the Commissioner attempts to argue that, based on the record, Ms. Krebs's opinion was not entitled to significant weight and thus the ALJ's failure to discuss the opinion is not a basis for reversal and remand (Doc. 16, pp. 16-17), that argument is improper *post hoc* rationalization. *See Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App. 181, 192 (6th Cir. 2009) (a reviewing court must assess the propriety of the administrative agency's action on the grounds invoked by the agency) (citing *SEC v. Cherney Corp.*, 332 U.S. 194, 196 (1947)). If, as the Commissioner suggests, the ALJ considered Ms. Krebs's opinion and discounted it because she determined that it was inconsistent with other record evidence, the ALJ should have explained the weight given or otherwise made clear her reasons for rejecting it in accordance

---

[27] Ms. Krebs's December 17, 2009, report is also contained in a separate exhibit, Exhibit 21F. Tr. 515.

with SSR 06-03p.  This is especially true in light of the fact that, if Ms. Krebs's opinion was given weight it could have impacted the outcome since it contained significant limitations.

Accordingly, for the reasons discussed above, reversal and remand is warranted for further proceedings consistent with this Opinion.

**B.      Other issues**

Scappino also argues that the ALJ did not include limitations in the RFC sufficient to account for her finding that Scappino had moderate limitations in concentration, persistence, and pace (Doc. 15, pp. 12-13); that the ALJ erroneously relied upon the consultative examining physician's opinion that Scappino can perform sedentary and light work (Doc. 15, pp. 15-17; Doc. 19, pp. 4-5); and that the ALJ's credibility finding is not supported by substantial evidence (Doc. 15, p. 17; Doc. 19, pp. 3-4).  This Opinion does not address Scappino's additional arguments because, on remand, the ALJ's further evaluation of the evidence relating to fibromyalgia and the opinion of the physical therapist may impact her findings with respect to the evaluation of the opinion evidence,[28] Scappino's RFC, the credibility analysis and/or her findings under the remaining steps of the sequential analysis.  *See Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

---

[28] For example, the treatment records which reflect treatment for fibromyalgia (Tr. 676, 685, 688) and Ms. Krebs's opinion (Tr. 568-570) are from 2010, after the consultative examining physician's evaluation (June 9, 2009) (Tr. 386).  Thus, after more thoroughly reviewing the records with respect to fibromyalgia and the physical therapist's opinion, the ALJ may re-assess the weight provided to Dr. Waldbaum's opinion.

## VII. Conclusion

For the reasons set forth herein, the Court **REVERSES AND REMANDS** the Commissioner's decision.[29]


Dated:  March 19, 2014

_____
Kathleen B. Burke
United States Magistrate Judge

---

[29] This Opinion should not be construed as requiring a determination on remand that Scappino is in fact disabled.